# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

| |
|---|
| JOY BROCK, as Personal Representative of the Estate of Richard Brock, deceased, |
| Plaintiff, |
| v. |
| UNITED STATES OF AMERICA, |
| Defendant. |

Case No. 3:21-cv-679-JAR-JBT

## OPINION AND ORDER

Jane A. Restani, Judge[*]:

Plaintiff, Joy Brock, as personal representative of the Estate of Richard Brock, deceased, brought this medical malpractice action against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. Mrs. Brock claims that her husband Richard Brock died as a result of negligence on the part of medical staff at Naval Hospital Jacksonville ("NHJ") in Jacksonville, Florida, where he was a patient at the Family Practice Clinic. Compl. at ¶ 25, ECF No. 1 (July, 9, 2021) ("Compl."). Mrs. Brock contends that the medical staff at NHJ, including Advanced Registered Nurse Practitioner ("ARNP") Karen Elgin fell below the applicable professional standards of care in failing to properly evaluate, diagnose, and treat Mr. Brock. Id. Specifically, Mrs. Brock alleges that the defendant, by and through its employee ARNP Elgin failed to order a complete blood count ("CBC"), which would have allegedly shown signs of the

---

[*] Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

Case No. 3:21-cv-679-JAR-JBT

blood disorder that caused Mr. Brock's decline and eventual death. Id. The United States asserts that ARNP Elgin did not fall below the standard of care, that nothing indicates that Mr. Brock had a blood disorder on the day he had his appointment with ARNP Elgin, and that even if a breach in the standard of care occurred, that breach was not the proximate cause of Mr. Brock's death. Answer at ¶ 25, ECF No. 8 (Oct. 4, 2021).

The court held a bench trial to resolve this claim. The court finds that Mrs. Brock has demonstrated that the United States fell below the standard of care, that this breach was the proximate cause of Mr. Brock's death, and that Mrs. Brock is entitled to damages.

## APPLICABLE LAW

### I. Jurisdiction and Legal Standard

In a negligence action under the Federal Tort Claims Act, the law of the place where the alleged act or omission occurred controls. 28 U.S.C. §§ 1346(b)(1), 2674. Here, the alleged negligence occurred at the Naval Hospital Jacksonville in Jacksonville, Florida; therefore, Florida law governs. Joint Ex. 1, ECF No. 64-1 (July 31, 2023) ("Jt. Ex. 1"). Under Florida law, the plaintiff must prove by the preponderance of the evidence (1) the standard of care owed by the defendant, (2) that the defendant breached that standard of care, and (3) that the breach proximately caused the plaintiff's damages. See Fla. Stat. §§ 766.102(1) (2013), 766.102(3)(b); Prieto v. Total Renal Care, Inc., 843 F. App'x 218, 224 (11th Cir. 2021).

"The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102(1). In medical malpractice claims, the standard of care is determined by a consideration of expert testimony. Pate v. Threlkel, 661 So. 2d 278, 281 (Fla. 1995). To establish

2

Case No. 3:21-cv-679-JAR-JBT

proximate cause in Florida, a plaintiff must prove that the defendant's negligence more likely than not caused the plaintiff's injury. Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984).

## FINDINGS OF FACT

### I.    General Case Background

1. Richard Brock died on March 29, 2019, at the age of 54.  Pl.'s Ex. 28, ECF No. 65-6 (July 31, 2023) ("Pl.'s Ex. 28").

2. Mr. Brock married Joy Brock on December 15, 2015, and Joy is the Personal Representative of the Estate of Richard Brock.  Pl.'s Ex. 29, ECF No. 65-7 (July 31, 2023);  Compl. at ¶ 9.

3. Prior to his death, Richard Brock served in the U.S. Army for almost twenty years, spent twelve years as a government contractor with the U.S. Military, and then was employed as a mail carrier with the United States Postal Service ("USPS") for nearly two years until his death.  Transcript of Bench Trial (Volume 1 of 4) at 225:1–22, ECF No. 69 (Aug. 22, 2023) ("Vol. 1"); Jnt. Ex. 12 at USPS_0019.

4. The court held a bench trial July 24, 2023, to July 27, 2023.

5. Plaintiff presented six witnesses.  First, Dr. Arthur Herold, who testified regarding the appropriate standard of care.  Vol. 1, 9:1-154:25.  Second, Dr. Bernard Pettingill, who testified regarding damages.  Vol. 1, 155:1-219:25.  Third, Catherine Stepalavich, Mr. Brock's sister, who testified regarding Mr. Brock's activity and marriage prior to his death. Vol. 1, 220:1-251:25.  Fourth, Joy Brock, Mr. Brock's wife, who testified regarding Mr. Brock prior to his death.  Vol. 1, 252:1-278:23.  Fifth, Dr. Alexander Duncan, who testified regarding causation.  Transcript of Bench Trial (Volume 2 of 4) at 11:1-138:25, ECF No.

3

Case No. 3:21-cv-679-JAR-JBT

66 (Aug. 21, 2023) ("Vol. 2"). Sixth, Dr. John Schweiger, who testified regarding causation. Vol. 2, 142:1-239:25.

6. The defense presented three witnesses. First, ARNP Elgin who testified by prior recording as to her common practice and her interpretation of the notes she made on March 21, 2019. See Elgin Tr., ECF No. 62 (July 26, 2023) ("Elgin Tr."). Second, Dr. Pallav Mehta, who testified regarding causation. Transcript of Bench Trial (Volume 3 of 4) at 14:1-196:8, ECF No. 67 (Aug. 21, 2023) ("Vol. 3"). Third, Dr. Rosaline Vasquez, who testified regarding the appropriate standard of care. Transcript of Bench Trial (Volume 4 of 4) at 5:1-165:11, ECF No. 68 (Aug. 21, 2023) ("Vol. 4").

7. The parties dispute whether ARNP Elgin diagnosed Mr. Brock with an Upper Respiratory Infection ("URI") or a common cold. Although ARNP Elgin entered the code for an "[a]cute upper respiratory infection, unspecified," she referred to common colds and URIs interchangeably in her testimony. Joint Ex. 5, NHJ_0257, ECF No. 64-5 (July 31, 2023) ("Jt. Ex. 5"); Elgin Tr. 77:14-21 ("[I] got the impression that he had an upper respiratory infection, a common cold."). Dr. Herold testified that there are a number of types of URIs such as tonsillitis and ear infections, but that if those are not present, then the typical URI is a mild cold virus and the two are considered very close synonyms. Vol. 1, 21:10-22:6. Dr. Vasquez testified that a common cold is a subset of a URI, particularly focusing on the nose and throat. Vol. 4, 13:2-7. For the purposes of this opinion, the court finds that an unspecified URI is typically a common cold, and the court interprets witness testimony as using them interchangeably except where specified otherwise.

8. Systemic inflammatory response syndrome ("SIRS") is the presence of two or more of the following signs: abnormal body temperature, heart rate, respiratory rate, blood gas, and

white blood cell count. Vol. 2, 152:6-154:7. Sepsis occurs when a patient is diagnosed with SIRS, and there is a known or suspected source of infection. Id. Severe Sepsis includes evidence of organ dysfunction, and Septic Shock occurs when the patient's underlying process has progressed such that the patient's blood pressure remains low despite attempts by the physician to restore adequate volume. Id.

9. Neutropenic sepsis is an infection "caused by the fact the patient has no white blood cells to defend himself with" and thus the patient is more predisposed to infections, triggering a septic response. Vol. 2, 17:24-18:1, 154:8-155:14. White blood cells contain lymphocytes and neutrophils. Id.; Vol. 3, 59:23-60:11. Neutropenia (low neutrophils) is commonly seen with patients who have bloodborne cancer. Vol. 2, 155:7-14.

10. Pancytopenia occurs when all three blood elements are low. Vol. 1, 30:15-18. The three elements are red blood cells, white blood cells, and platelets. Id.

11. Lymphoma is a type of hematological malignancy or blood cancer that can exist in the body without a solid tumor and typically presents as Hodgkin's or non-Hodgkin's lymphoma. Vol. 2, 232:17-234:19.

## II. Undisputed Events

### a. Time period prior to appointment with ARNP Elgin

12. On March 9, 2019, Mr. Brock began experiencing symptoms such as cough, congestion, chills, fatigue, and body aches. Joint Ex. 4 at NHJ_0234, ECF No. 64-4 (July 31, 2023) ("Jt. Ex. 4")

13. On Monday, March 11, 2019, Mr. Brock took an unscheduled full day of leave without pay and reported to the emergency department at the NHJ at 8:56 a.m. Jt. Ex. 4, NHJ_0233;

Case No. 3:21-cv-679-JAR-JBT

Joint Ex. 12 at USPS_0172, USPS_0183, USPS_0194, ECF No. 64-12 (July 31, 2023) ("Jt. Ex. 12").

14. At this visit, Mr. Brock reported each of the symptoms he began experiencing on March 9, 2019, but did not report vomiting, shaking, inadequate oral intake, shortness of breath, or abdominal pain. Jt. Ex. 4, NHJ_0234.

15. Mr. Brock reported pain of five out of ten, was diagnosed with a URI, and prescribed Mucinex DM, Tessalon Perles, Tylenol, and Motrin. Jt. Ex. 4, NHJ_0238, NHJ_0233–35. The physical exam reported a temperature of 99.2 degrees Fahrenheit and a heartrate of 106. Id. at NHJ_0233.

16. On Wednesday, March 13, 2019, Mr. Brock again took an unscheduled full day of leave without pay and reported to the emergency department, this time at University of Florida Shands Jacksonville ("Shands") emergency room at 5:45 a.m. Jt. Ex. 12, USPS_0172; Joint Ex. 11 at UF_0006, ECF No. 64-11 (July 31, 2023) ("Jt. Ex. 11").

17. Mr. Brock again reported pain of five out of ten, and that he had been experiencing nausea, vomiting, fever, cough, myalgias, and diarrhea for three to five days. Jt. Ex. 11, UF_0006, UF_0028. Additionally, although Mr. Brock said the onset was gradual, the problem had not changed since onset. Id. The record indicates that Mr. Brock did not have complaints of shortness of breath or lightheadedness. Id. Shands prescribed Ondansetron, an anti-nausea medicine, as needed and instructed Mr. Brock to follow up with his primary care physician and return to the emergency room if symptoms changed or worsened. Id. at UF_0007–0012; Vol. 1, 43:10-16. The physical exam reported a temperature of 98.2 degrees Fahrenheit and a heartrate of 94. Jt. Ex. 11, UF_0007.

Case No. 3:21-cv-679-JAR-JBT

18. Five days later, on Monday, March 18, 2019, Mr. Brock presented to Shands at 6:15 a.m. Jt. Ex. 11, UF_0036–39. The medical record includes slight contradictions here. The Certified Physician Assistant ("PA-C") that conducted Mr. Brock's exam noted that Mr. Brock reported "flu like symptoms," that he had pain of seven out of ten, but that his only symptoms were nasal congestion and cough. Id. at UF_0039–44. Additionally, the PA-C noted that Mr. Brock denied experiencing fever, nausea, vomiting, or a litany of other symptoms. Id. Alternatively, the Registered Nurse noted that Mr. Brock complained of fever, body aches, nausea, and vomiting that had started March 11, 2019. Id. at UF_0044. The apparent contradiction could be explained by a temporal description of what Mr. Brock felt in the moment versus over the past week. The physical exam reported a temperature of 100.2 degrees Fahrenheit and a heartrate of 92. Id. at UF_0041.

19. Shands conducted a lung examination and chest x-ray which showed normal results. Jt. Ex. 11, UF_0042. The PA-C instructed Mr. Brock to follow up with his primary care physician and Mr. Brock agreed. Id. Mr. Brock called NHJ Family Practice Clinic to schedule an appointment with a primary care physician for three days later. Joint Ex. 6 at NHJ_0261, ECF No. 64-6 (July 31, 2023) ("Jt. Ex. 6").

   b. March 21, 2019, Appointment with ARNP Elgin[1]

20. Mr. Brock presented to the Family Practice clinic at NHJ at 8:40 a.m. for his scheduled ER follow-up and was evaluated by ARNP Elgin. Jt. Ex. 5, NHJ_0254. Although Mr. Brock reported that he was pain-free, he complained of mild dyspnea (shortness of breath), dry cough, tactile fevers, and night sweats. Id. Additionally, the review of symptoms recorded

---

[1] ARNP Elgin testified to the fact that she did not specifically recall the visit with Mr. Brock. Elgin Tr. 25:10-13. Accordingly, the court finds that the medical note created for the visit is the most reliable source of information regarding what transpired during the visit.

Case No. 3:21-cv-679-JAR-JBT

by ARNP Elgin listed fatigue, fever, chills, headache, nasal discharge, nausea, lightheadedness, cough, and shortness of breath during exertion. Id. at NHJ_0255. The review of symptoms recorded several negative symptoms such as no sinus pain, no watery or red eyes, no earache, and no sore throat. Id.

21. The physical exam reported a temperature of 98.3 degrees Fahrenheit and a heartrate of 60. Jt. Ex. 5, NHJ_0254–56. Additionally, ARNP Elgin recorded that Mr. Brock was well-appearing, and that he had no abnormal physical findings with his neck, ears, nose, oral cavity, pharynx, lymph nodes, or cardiovascular system. Id. Finally, ARNP Elgin recorded normal nasal mucosa, no nasal discharge seen, no redness of the nasal turbinate, no sinus tenderness, and throat and tonsils were normal. Id.

22. In the history of present illness, there appears to be a typo, but Mr. Brock informed ARNP Elgin that he had been suffering from flu-like symptoms for ten to eleven days, that he had been diagnosed with a URI, and that he had visited the ER three times. Jt. Ex. 5, NHJ_0254, NHJ_0257; Elgin Tr. 32:1-5. Additionally, ARNP noted that Mr. Brock "[t]hinks it is time for antibiotics. Does not believe 'viral.' . . . Mailman. Many ill contacts. Wife is well. Albuterol without any relief. . . . Seeking routine labs." Jt. Ex. 5, NHJ_0254. ARNP Elgin testified that "routine labs" meant that Mr. Brock specifically asked for an order for blood work. Elgin Tr. 34:20-24.

23. ARNP Elgin diagnosed Mr. Brock with an "[a]cute upper respiratory infection, unspecified J06.9: Again, likely viral, but due to duration [of sickness], will start doxy [f]or anti-inflam effect." Jt. Ex. 5, NHJ_0257. Additionally, ARNP Elgin demonstrated correct use of an inhaler and provided a strict return precaution. Id.

Case No. 3:21-cv-679-JAR-JBT

24. ARNP Elgin prescribed Benzonatate 100 mg oral cap for the cough, a spacer for use with the albuterol inhaler, Ibuprofen 600 mg oral tabs, and Doxycycline Hyclate 100 mg oral tab. Jt. Ex. 5, NHJ_0257. Additionally, ARNP Elgin ordered a comprehensive metabolic panel ("CMP") and lipid panel to supplement the CMP Mr. Brock received in 2017.[2] Id.; Jt. Ex. 11, UF_0101. Mr. Brock was released without limitations and was to follow up as needed. Id. The medical note does not list any instructions or notes related to the CMP, nor education on the importance of having the blood test done immediately. See generally id.; Jt. Ex. 5, NHJ_0254–57.

c. Time period after appointment with ARNP Elgin

25. At NHJ, the laboratory where blood is drawn for tests is located across the hall from the pharmacy. Elgin Tr. 174:2-6. Mrs. Brock testified that she and Mr. Brock picked up the prescriptions and waited approximately ten minutes for them but did not go to the laboratory to have Mr. Brock's blood drawn. Vol. 2, 253:9-25. Mr. Brock did not have his blood drawn for the CMP or lipid panel. Joint Ex. 7 at NHJ_0264, ECF No. 64-7 (July 31, 2023).

26. During the week following his appointment with ARNP Elgin, Mr. Brock took no leave without pay and worked 6.90 hours on March 23, 2019, and 7.54 hours on March 25, 2019. Jt. Ex. 12, USPS_0175, 0183, 0192–93. Mr. Brock took a turn for the worse late at night on March 26, 2019, and was seen shivering by Mrs. Brock and she felt a fever. Vol. 1, 269:22–270:01. This was the first time Mrs. Brock observed Mr. Brock with a high fever.

---

[2] ARNP Elgin testified that the CMP was not ordered as part of a diagnostic evaluation of Mr. Brock. Elgin Tr. 137:19-21.

Case No. 3:21-cv-679-JAR-JBT

Vol. 2, 256:20–257:01. Upon Mrs. Brock's insistence, she drove Mr. Brock to the emergency room. Vol. 1, 269:20–270:07.

d. Final ER Visit to Shands

27. On Wednesday, March 27, 2019, at 4:58 a.m. Mr. Brock presented to Shands emergency room. Jt. Ex. 11, UF_0072. Mr. Brock complained of flu like symptoms for two weeks, and complained of fever, cough, sinusitis, and generalized body aches. Id. at UF_0073. Mr. Brock reported that he "[t]hought he was getting better but then past three to four days he has gotten worse." Id. Mr. Brock reported that he had no diarrhea, no nausea, no rhinorrhea, no shortness of breath, no sore throat, and no vomiting. Id. During Mr. Brock's initial evaluation, although Mr. Brock appeared "well-developed and well-nourished" without distress, he had a temperature of 101 degrees Fahrenheit and heartrate of 124. Id. at UF_0075–76.

28. Dr. Ian Storch evaluated Mr. Brock during his first four hours at Shands. Jt. Ex. 11, UF_0068. Dr. Storch then ordered a CBC,[3] which reported a white blood cell count of .43, with the normal range being 4.5 – 11, a red blood cell count of 3.04, with the normal range being 4.50 – 6.30, a hemoglobin count of 8.5, with the normal range being 14.0 – 18.0, and a platelet count of 35, with the normal range being 140 – 440.[4] Id. at UF_0078. The white blood cell count and platelet count were so low that a read back was called in to ensure accuracy. Id.; Vol. 2, 184:8-16. Dr. Storch found this pancytopenia concerning but could not determine the cause. Jt. Ex. 11, UF_0082.

---

[3] There is no record of a CBC prior to the one ordered by Dr. Storch.
[4] Units are omitted.

Case No. 3:21-cv-679-JAR-JBT

29. In an attempt to determine the cause of Mr. Brock's condition, Dr. Storch ordered a CMP, a chest x-ray, and an urinalysis ("UA"). Id. at UF_0068–83. All three checks came back normal. Id. Additionally, Dr. Storch ordered blood drawn for blood cultures at 5:45 a.m. Id. at UF_0096. The cultures showed no growth at less than 24 hours of incubation, id., nor after five days, id. at UF_0255–57.

30. With a fear of potential sepsis and febrile neutropenia, Dr. Storch ordered antibiotics and Acyclovir (anti-viral medication), and transfusions of two units of platelets. Jt. Ex. 11, UF_0068–83. Finally, Dr. Storch admitted Mr. Brock to the hospital for further evaluation and treatment. Id. at UF_0082.

31. After admission, Mr. Brock was evaluated by hospitalist Dr. Vijayarama Vegesna. Jt. Ex. 11, UF_0068. Dr. Vegesna ordered a number of tests, including a gram stain, which is a rapid way of determining the presence of bacteria in a tissue fluid. Id. at UF_0098; Vol. 2, 68:20-25. The gram stain resulted in no organisms seen. Jt. Ex. 11, UF_0098. Additionally, Dr. Vegesna conducted a physical exam which noted that Mr. Brock had no suspicious lesions or rashes.[5] Id. at UF_0094.

32. Dr. Vegesna diagnosed Mr. Brock with neutropenic sepsis and pancytopenia based on the findings from the CBC. Id. at UF_0099. Dr. Vegesna took steps to treat a potential infection, including meningitis, and requested additional tests such as blood cultures and urine and cerebrospinal fluid analysis. Id.; Vol. 2, 174:10-175:15; Vol. 2, 178:3-13.

---

[5] Later on in the day on March 27, 2019, a bruise was noticed on Mr. Brock's left lower extremity and first recorded in Dr. Ravi's review of systems. Jt. Ex. 11, UF_0103. This bruise was later referred to as an ulcerated circular lesion and identified as a potential insect bite. Id. at UF_0128, UF_0134.

11

Case No. 3:21-cv-679-JAR-JBT

Additionally, Dr. Vegesna requested a consult from an infectious disease specialist. Jt. Ex. 11, UF_0099; Vol. 2, 178:14-20.

33. Mr. Brock was assessed by infectious disease physician Dr. Malleswari Ravi on March 27, 2019. Jt. Ex. 11, UF_0101. After reviewing all of the medication Mr. Brock had taken both at Shands and prior to his arrival, as well as the tests and evaluations conducted at Shands on the 27th, Dr. Ravi could not identify any specific source of infection. Id. at UF_0108. Dr. Ravi requested additional testing and a hematology/oncology consult. Id.

34. Dr. Jason Hew conducted the hematology/oncology consult, and concluded that the "[o]verall clinical picture is highly suspicious of an acute hematological malignancy." Jt. Ex. 11, UF_0136. Dr. Hew recommended an "[u]rgent bone marrow aspirate and biopsy" and discussed transferring Mr. Brock to UF Downtown in the event that inpatient chemotherapy was necessary. Id. at UF_0134–36. Mr. Brock wanted to see the results of the bone marrow biopsy prior to being transferred. Id. at UF_0137.

  e.  Mr. Brock's decline and death

35. On March 28, 2019, Mr. Brock received a blood transfusion of two units of blood, including one at a rapid rate over one hour. Jt. Ex. 11, UF_0138, UF_0161. After completion of the second unit, Mr. Brock's oxygen levels dropped and he was transferred to the ICU. Id. at UF_0161. His status continued to worsen, and on March 29, 2019, he began to lose a pulse and his blood pressure could not be maintained. Id. After one final transfusion his pulse was again lost and the hospital was unable to reestablish a perfusing rhythm. Id. Mr. Brock was pronounced dead at 4:23 p.m. Id.

36. Mr. Brock's death certificate was issued by Dr. Hester and the official cause of death was listed as cardiac arrest, respiratory failure, cardiomyopathy, and pancytopenia. Pl.'s Ex.

Case No. 3:21-cv-679-JAR-JBT

28. The cause of death primarily relates to the heart, lungs, and blood. Id.; Vol. 2, 135:6-

25. Prior to March 28, 2019, there was no indication Mr. Brock was experiencing issues

with his heart or lungs. Vol. 2 193:7-195:24.

    f.  Autopsy

37. Dr. Brett Baskovich of UF Shands Health performed an autopsy on Mr. Brock. Pl.'s Ex.

1 at J_0469–70, ECF No. 65-1 (July 31, 2023) ("Pl.'s Ex. 1"). The autopsy was ordered

on April 3, 2019, and preliminarily signed on April 5, 2019. Id. at J_0469, J_0475.

38. The clinical history and final summary reports Mr. Brock as a patient with "past medical

history of febrile neutropenia, lower extremity cellulitis, neutropenic sepsis, pancytopenia

and severe biventricular dysfunction, who presented with fever and flu-like symptoms and

was admitted." Pl.'s Ex. 1, J_0469. The report continues that Mr. Brock "received red

blood cell transfusion followed by rapid clinical deterioration. Resuscitation attempts

failed and the patient was pronounced dead on 3/29/19 at 1623." Id.

39. The major autopsy findings included "cardiomegaly, congestion of the lungs and bilateral

pleural effusion." Id. at J_0470. Significantly, the autopsy notes that the "bone marrow is

hypercellular, but evaluation is suboptimal at autopsy due to autolysis of the majority of

the cells. While a leukemia would be a possible cause, such hypercellularity could also be

seen as a reaction to conditions such as hemolysis." Id. The final summary concludes that

Mr. Brock's "demise was likely related to sepsis and pancytopenia as well as chronic heart

conditions."[6] Id.

---

[6] Dr. Schweiger, while interpreting the autopsy, cautioned the court that the autopsy examines
Mr. Brock's end of life conditions and that some of the findings developed extremely close to
death such as the cardiomegaly which was definitively not present on March 28, 2019. Vol. 2,
197:1-25.

Case No. 3:21-cv-679-JAR-JBT

## III.   Standard of Care

### a.   The court accepts Dr. Herold and Dr. Vasquez as Rule 702 experts

40. Plaintiff presented Dr. Arthur Herold as her standard of care expert. Dr. Herold is a medical doctor specializing in family practice medicine. Vol. 1 9:9-10:25. He graduated from medical school in 1980, performed a military residency, and has been board certified in Family Practice medicine since 1983. Id. He was a full-time faculty member at the University of South Florida College of Medicine from 1987 to 2022 where he taught medical students, nurse practitioner students, and physician assistant students. Id. The court accepts Dr. Herold as a Rule 702 expert witness in family practice medicine. Id. at 16:8-11.

41. Defendant presented Dr. Rosaline Vasquez as its standard of care expert. Dr. Vasquez runs a private consultative practice where she consults with hospitals on the severity and gravity of a patient's illness. Vol. 4, 5:13-23. Additionally, Dr. Vasquez is a clinical adjunct professor at the Stanford School of Medicine where she teaches residents and students patient care in an outpatient capacity. Id. at 5:7-9:12. Dr. Vasquez is board certified in Internal Medicine. Id. The court accepts Dr. Vasquez as a Rule 702 expert witness in the field of internal medicine. Id. at 9:19-23.

### b.   Dr. Herold's opinions as to the standard of care and breach

42. Dr. Herold testified that ARNP Elgin fell below the standard of care in her examination and assessment of Mr. Brock on March 21, 2019. Vol. 1, 55:19-58:22. To support this, he testified that it was unheard of for a patient with a URI to visit an emergency room three times prior to seeing a primary care provider. Id. at 19:18-20:23. Dr. Herold noted that several symptoms, including the length of illness, tactile fevers, and night sweats were

14

inconsistent or not prominent symptoms with a URI.  Id. at 39:4-48:9.  Of particular importance to Dr. Herold was Mr. Brock's shortness of breath with exertion, which Dr. Herold testified is a significant finding that indicates a worsening condition.  Id. at 142:22-143:8.  Additionally, Dr. Herold noted that albuterol, which Mr. Brock reported was helping his symptoms, is a medication for the lower, not upper respiratory tract and should not affect a URI.  Id. at 36:17-41:11.  Dr. Herold testified that together, these symptoms, which ARNP Elgin should have taken as true, should have indicated that Mr. Brock had something more serious than a URI.  Id.

43. Additionally, Dr. Herold noted that several common indicators of a URI were not present, such as sinus pain, watery or red eyes, earache, and sore throat.  Id. at 45:18-52:12.  ARNP Elgin failed to note a pulmonary examination, abdominal examination, and examination of the eyes, which Dr. Herold noted were essential examinations that could have shown indicators of a low blood count.  Id. at 54:3-23.  Finally, considering the length of illness, Dr. Herold testified that ARNP Elgin should have reviewed the medical records from Mr. Brock's ER visits, and that she fell below the standard of care by failing to do so.  Id. at 56:12-21.  Overall, Dr. Herold testified that it was ARNP Elgin's responsibility to reconcile the inconsistencies in the record with a diagnosis of a URI.  Id. at 56:12-57:25.

44. Dr. Herold testified that due to Mr. Brock's report that he had been experiencing tactile fevers for ten to eleven days, ARNP Elgin should have included sepsis on her differential diagnosis list.  See Vol. 1, 68:12-20.  Accordingly, Dr. Herold testified a CBC was required to evaluate Mr. Brock, particularly to identify whether there was a disturbance in his white blood cell count.  Id.  A CBC is used for symptomatic patients whereas a CMP is for asymptomatic patients.  Id. at 28:25-29:15.

Case No. 3:21-cv-679-JAR-JBT

45. In summary, it was Dr. Herold's opinion that ARNP Elgin violated the standard of care by failing to order a CBC for Mr. Brock on March 21, 2019.

c.  Dr. Vasquez's opinions as to the standard of care and breach

46. Dr. Vasquez testified that ARNP Elgin met the standard of care in her treatment of Mr. Brock. First, she testified that ARNP Elgin took an excellent patient history. Vol. 4, 11:20-23. Next, she testified that ARNP Elgin performed a focused and detailed physical exam and thoroughly documented the results, with the exception of the lung exam. Id. at 12:5-10. Dr. Vasquez testified that a URI can last anywhere from seven to ten days, or up to three weeks, and that symptoms can peak at day two or three. Id. at 15:17-24. Finally, Dr. Vasquez testified that Mr. Brock's three prior ER visits were not alarming; instead testifying that the visits indicated that Mr. Brock sought treatment while feeling ill. Id. at 37:22-38:5.

47. In summary, Dr. Vasquez concluded that Mr. Brock's symptoms, vitals, and physical exam were well within the normal range of a URI and that ARNP Elgin did not breach the standard of care by failing to obtain Mr. Brock's medical records or order a CBC. In fact, Dr. Vasquez opined that it would have been wasteful to order a CBC for Mr. Brock, and that there was no unanswered clinical question that laboratory data would have helped diagnose. Vol. 4, 74:3-10; 83:14-21.

48. Dr. Vasquez, however, admitted that Mr. Brock presented with some signs and symptoms of anemia such as shortness of breath, fatigue, and dizziness. Vol. 4, 85:10-86:7. Additionally, Dr. Vasquez admitted that a CBC is appropriate when a patient is suspected of having anemia. Id. Dr. Vasquez admitted that ARNP Elgin should have assumed Mr. Brock's statements regarding his illness were accurate. Id. at 57:25-58:6. Accordingly,

16

Dr. Vasquez admitted that a twelve-day history of fever and chills is a pertinent finding, and that in her own practice she has investigated a patient with a febrile illness that had lasted for twelve days. Id. at 138:8-11.

49. Dr. Vasquez testified that based on the ER records Mr. Brock was getting better; she admitted, however, that ARNP Elgin did not have access to the ER records to make that determination and that Mr. Brock told his healthcare providers, including ARNP Elgin, that he was not feeling better, not getting better, and that he was perplexed as to why his symptoms had not gone away. Id. at 115:4-116:24. Finally, Dr. Vasquez admitted that there was no medical evidence that Mr. Brock had a URI, and that he had no complaints of common symptoms such as sneezing, runny nose, sore throat, post-nasal drip, or watery eyes. Id. at 92:9-15, 148:22-25, 149:19-24, 152:12-153:2. Yet, Dr. Vasquez testified that Mr. Brock presented with a "very, very stereotypic presentation of an upper respiratory infection." Id. at 92:17-21.

d. ARNP Elgin breached the standard of care

50. In consideration of the many inconsistencies in Dr. Vasquez's testimony, the court finds that Dr. Vasquez's opinions are not credible and are unsupported by the evidence in this case.

51. The court finds that Dr. Herold's opinions were reasonable and consistent, and therefore accepts and incorporates all of Dr. Herold's standard of care opinions listed supra Findings 42–44 as to breach of standard of care.

52. In particular, the court finds that ARNP Elgin failed to reconcile the inconsistency between Mr. Brock's history of illness and presenting signs and symptoms with her diagnosis; failed to conduct a thorough exam; failed to obtain and review Mr. Brock's medical records from

Case No. 3:21-cv-679-JAR-JBT

his recent ER visits; failed to consider alternative causes for his condition; failed to satisfy Mr. Brock's request for diagnostic blood work; and ultimately fell below her standard of care by failing to order a CBC and educate Mr. Brock on the importance of having the lab work completed. The court finds the breach to be clearly established.

## IV. Proximate Cause

a. The court accepts Dr. Schweiger, Dr. Duncan, and Dr. Mehta as Rule 702 experts

53. Plaintiff presented Dr. John Schweiger as her first expert witness on the issue of causation. Dr. Schweiger is a medical doctor specializing in critical care medicine and anesthesiology. Vol. 2, 142:21-144:18. Additionally, Dr. Schweiger became an associate professor and the Director of the Critical Care Program at University of South Florida College of Medicine in 1999 and has been a full clinical professor since 2017. Id. Dr. Schweiger is board certified in anesthesiology, critical care, and acute and chronic pain management. Id. at 145:23-146:5. On a day-to-day basis, Dr. Schweiger spends the vast majority of his time in a clinical setting where approximately half of his work is done in the intensive care units. Id. at 146:15-157:4. Dr. Schweiger estimates that he has managed over 6,000 patients with a diagnosis of sepsis, approximately 300 to 400 patients with neutropenic sepsis, and approximately 300 to 400 patients with pancytopenia. Id. at 147:9-25. The court accepts Dr. Schweiger as a Rule 702 expert witness in critical care medicine. Id. at 149:14-150:3.

54. Plaintiff presented Dr. Alexander Duncan as her second expert witness on the issue of causation. Dr. Duncan is a medical doctor specializing in clinical pathology (the study and interpretation of laboratory testing) and transfusion medicine. Vol. 2, 14:13-23. He graduated from medical school in Glasgow, Scotland, and completed two residencies and a fellowship at the Mayo Clinic in Rochester, Minnesota. Id. at 12:4-20. Between 1984

Case No. 3:21-cv-679-JAR-JBT

and 2022, Dr. Duncan held various positions at Emory University School of Medicine, working in interventional laboratory medicine, transfusion medicine, and special coagulation. Id. at 12:23-13:4, 27:4-5, 28:3-8, 29:3-30:16. During this period, Dr. Duncan spent about ten years as the director of the hemapheresis section, was an appointed member of the Department of Hematology and Oncology, and saw patients on a weekly basis. Id. Dr. Duncan is currently board certified in clinical pathology and transfusion medicine, and was previously board certified in internal medicine. Id. at 14:13-18. Dr. Duncan estimates that he has evaluated and diagnosed about one hundred patients with neutropenic sepsis and has diagnosed blood cancer hundreds of times in his career. Id. at 18:19-23, 130:14-18. The court accepts Dr. Duncan, over objection, as a Rule 702 expert witness in hematology with a focus in transfusion medicine and clinical pathology. Id. at 37:19-21.

55. The defense presented Dr. Pallav Mehta as its only witness on the issue of causation. Dr. Mehta is a medical doctor specializing in hematology and oncology and is board certified in hematology, oncology, and integrative medicine. Vol. 3, 14:8-25. Dr. Mehta is an assistant professor of medicine at the MD Anderson Cancer Center, and is the chief of hematology and oncology at one of the MD Anderson satellite hospitals: Redeemer Holy Hospital in Philadelphia. Id. at 14:16-15:9. Additionally, Dr. Mehta is the medical director of the cancer center and the director of integrative oncology at this satellite. Id. Outside of the clinical setting where Dr. Mehta primarily sees breast cancer patients, Dr. Mehta is the medical director of a venture-funded oncology innovation startup company. Id. at 15:16-16:5. The court accepts Dr. Mehta, as a Rule 702 expert witness in oncology and hematology. Id. at 24:6-25:1.

Case No. 3:21-cv-679-JAR-JBT

    b.  <u>Dr. Schweiger's opinions as to cause of death</u>

56. Dr. Schweiger testified that he believes Mr. Brock had a bloodborne malignancy, which caused his pancytopenia and neutropenic sepsis, which led to his death.  Vol. 2, 156:5-157:3.  To support his opinion, Dr. Schweiger relied on the process of elimination, narrowing the possible causes of Mr. Brock's symptoms to just a bloodborne malignancy. <u>Id.</u>

57. First, Dr. Schweiger found no potential source of an infection.  Upon admission, despite numerous skin assessments no doctor or nurse noted any significant skin injuries, bruising, or cellulitis on Mr. Brock.  Vol. 2, 175:21-178:13.  Additionally, the chest x-rays and CT scan were negative for any lung processes.  <u>Id.</u> at 175:21-176:18.  The tests ordered to evaluate Mr. Brock's blood, urine, and cerebral spinal fluid also all came back negative for an infection.  <u>Id.</u> at 175:21-178:13.

58. Second, Dr. Schweiger testified that Mr. Brock did not present as a patient whose severe sepsis caused his pancytopenia.  In Dr. Schweiger's experience, patients admitted with sepsis do look ill as opposed to reasonably well, have acute respiratory failure, acute kidney injury with dramatic reduction in urine output, and their creatine is markedly elevated.  Vol. 2, 155:15-157:3.  Mr. Brock had none of these symptoms.  <u>Id.</u> at 156:5-157:3.  Additionally, when pancytopenia is caused by severe sepsis, patients have profound low blood pressure prior to the pancytopenia and Mr. Brock had blood pressure within the normal range upon admission.[7]  <u>Id.</u> at 161:12-163:5, 168:2-171:8; Jt. Ex. 11, UF_0075.

---

[7] Dr. Schweiger testified that MR. Brock did not have "his first critically low blood pressure" until later in the evening on March 28, 2019, over 24 hours after admission.  Vol. 2, 186:7-9.

59. Third, Dr. Schweiger testified that additional testing and treatment in the hospital confirmed the lack of severe sepsis upon arrival. Vol. 2, 181:10-184:4. Mr. Brock had a lactic acid of 0.6, but a neutropenic patient with severe sepsis not caused by the neutropenia must have lactic acid greater than 4.0. Id. Further, Mr. Brock's white blood cell count went from .43 upon arrival to .42 the next day—indicating that despite the initial treatment with antibiotics and fluid management, he did not improve. Id. This indicated to Dr. Schweiger that there must be another major underlying process in Mr. Brock's bone marrow. Id.

60. Fourth, Dr. Schweiger agreed with the results of the infectious disease consult and the hematology/oncology consult. Vol. 2, 178:14-180:20, 184:17-185:3. On March 27, 2019, the infectious disease physician, Dr. Ravi, agreed with the initial application of antibiotics and antivirals, but could not find a source of an infection and recommended a hematology/oncology consult. Id. On March 28, 2019, still unable to identify a potential bacteria or virus, Dr. Ravi's partner stopped the anti-viral and one of the antibiotics. Id. According to Dr. Schweiger, it was clear the doctor was "not convinced that at the time they made [the initial recommendation for treatment] that he was being overwhelmed with either bacterial sepsis or viral sepsis, because common sense would dictate you would not stop broad-spectrum antibiotic therapy in a patient who's neutropenic if there was an active infection at the time." Id. at 180:1-6. Dr. Schweiger testified that Dr. Hew, the hematologist/oncologist that evaluated Mr. Brock, was concerned about a hematologic malignancy and attempted to convince Mr. Brock to undergo a bone marrow biopsy for confirmation. Id. at 184:17-185:3; Jt. Ex. 11, UF_0136–37 ("Overall clinical picture is highly suspicious of an acute hematological malignancy . . . . I discussed with the patient

Case No. 3:21-cv-679-JAR-JBT

transferring him to UF Downtown in the event that he needs inpatient chemotherapy but he refused. He wants to wait to see the results of the Bone Marrow first.").

61. Dr. Schweiger testified that Mr. Brock's eventual death was a result of a reaction to the hospital's attempt to treat his "severely low hemoglobin and hematocrit." Vol. 2, 185:9-189:21. Shands made the decision to give Mr. Brock a rapid blood transfusion, which overloaded the heart and lungs, eventually leading to Mr. Brock's organ failure and death. Id. Dr. Schweiger reviewed the death certificate and while he agreed, he testified that he does not think Mr. Brock had cardiomyopathy prior to March 29, 2019, and that Mr. Brock's cardiomyopathy was a result of the dying process that caused this sudden insult to his heart. Id. at 193:11-195:24.

   c.  Dr. Duncan's opinions as to cause of death

62. To begin his process of elimination, Dr. Duncan ruled out several causes of pancytopenia that the medical evidence did not support such as trauma, burns, autoimmune disease, nutritional deficiency, medications or drug toxicity, and megaloblastic anemia. Vol. 2, 63:19-64:20, 66:7-67:24.

63. Next, Dr. Duncan looked at a potential infection and determined that Mr. Brock did not have a bacterial infection upon admission. Vol. 2, 42:15-25. He explained that if Mr. Brock had a primary infection on admission, his white cell count would have been higher as his body's response to fight the infection. Id. Additionally, Dr. Duncan testified that the body should have pushed out neutrophils and bands[8] in response to a bacterial infection had Mr. Brock had one, yet there were zero bands. Id. at 67:25-68:13. Dr. Duncan also

---

[8] Bands are the immature precursor to normal neutrophils that can be pushed out when an acute process is happening in the body. Vol. 3, 58:24-59:19.

22

Case No. 3:21-cv-679-JAR-JBT

testified that had Mr. Brock had an infection, Dr. Duncan would have expected to see signs of abnormal organ function on the basic metabolic panel ("BMP") taken upon admission. Id. at 44:24-46:5. Yet, all of the BMP values were normal. Jt. Ex. 11, UF_0291–92. Finally, Dr. Duncan found the lack of growth on the blood cultures taken upon admission to be somewhat definitive, testifying that lack of growth after five days of incubation "would indicate that there's no evidence of bacterial infection of any kind." Vol. 2, 72:25-75:15, 105:19-106:1; Jt. Ex. 11, UF_0096, UF_0255.

64. Looking at a potential viral infection, Dr. Duncan testified there was no indication of a virus and all of the tests to find a viral infection came back negative. Vol. 2, 76:25-79:14, 80:5-81:2. Additionally, Dr. Duncan opined that Shands performed "a very, very complete [infectious disease] consult." Id. at 79:5.

65. Importantly, Dr. Duncan noted that Mr. Brock's blood cultures and blood draws for the CBC and BMP were taken prior to the administration of three powerful broad-spectrum antibiotics, and that the doxycycline taken previously would not have wiped out a severe infection or invalidated the laboratory studies. Vol. 2, 75:21-76:24.

66. As opposed to an infection, Dr. Duncan found several signs of an underlying hematological malignancy in the medical records. Primarily, the CBC showed that Mr. Brock had 22.6 atypical lymphocytes and he had lymphocytes in his cerebrospinal fluid. Vol. 11, UF_0079; UF_0095; UF_0135; UF_0290. These lymphocytes, Dr. Duncan explained, are an indicator of blood cancer, particularly of lymphoma. Vol. 2, 71:1-25. Dr. Duncan further noted that Dr. Hew asked for a hematopathologist to look at the lymphocytes. Id. Accordingly, considering the elimination of other potential causes of the pancytopenia, Dr.

Case No. 3:21-cv-679-JAR-JBT

Hew's consult, and the overall clinical picture, Dr. Duncan concluded that Mr. Brock must have had a hematological malignancy. Id. at 91:9-10.

67. Finally, Dr. Duncan testified that the autopsy evidence was consistent with lymphoma. Vol. 2, 94:16-25. First, Mr. Brock's enlarged spleen was consistent as the spleen produces B-cells,[9] and they increase in patients with lymphomatous diseases and lymphoid malignancies. Id. Second, Dr. Duncan testified that the hypercellularity in Mr. Brock's bone marrow indicated a hematological malignancy as the body typically pushes cells out to fight the cancer. Id. at 94:2-15. Dr. Duncan did qualify his analysis here, because the biopsy sample was very poor and mainly contained dead cells. Id. at 132:10-25.

68. The autopsy report notes, "[t]he findings are nonspecific and evaluation is severely limited by postmortem autolysis.[10] While leukemia is a possibility due to limited immunohistochemistry on the autolyzed tissue, the hypercellularity could also be explained by response to hemolysis[11] or other triggers." Pl.'s Ex. 1, J_0474. Dr. Duncan testified that this note must be read with the understanding that the hematopathologist who reviewed the bone marrow sample did not have all of Mr. Brock's medical records and was making generic suggestions based only on the autopsy results. Vol. 2, 96:16-97:3.

---

[9] B-cells and T-cells are a specific type of white blood cell called lymphocytes. B-cells: Types and Function, Cleveland Clinic (Feb. 1, 2023), https://my.clevelandclinic.org/health/body/24669-b-cells. Lymphocytes fight harmful invaders and abnormal cells like cancer cells. Id. Specifically, B-cells make antibodies in response to markers that the body uses to identify substances such as viruses and bacteria.

[10] Autolysis is a process of the blood cells in the body clotting and then breaking down after death. Vol. 2, 92:9-13.

[11] Hemolysis is the destruction or breakage of the cell membrane of the red blood cell, which allows the internal contents of the red blood cell to then explode into the bloodstream. Vol. 2, 236:13-18.

Case No. 3:21-cv-679-JAR-JBT

69. Dr. Duncan disagreed with the theory of hemolysis, as Mr. Brock's LDH levels were tested each day at Shands and came back normal every time. Vol. 2, 96:16-97:3. Dr. Duncan explained that LDH is lactate dehydrogenase and that when red cells are destroyed, LDH is released into the bloodstream. Id. at 96:16-99:10. Accordingly, Dr. Duncan testified that the body must have ceased production of red blood cells rather than destroyed them. Id. Supporting this, Dr. Duncan also noted that upon admission Mr. Brock's bilirubin[12] level was normal, and that if hemolysis was occurring prior to admission Mr. Brock's bilirubin level should have been elevated. Vol. 2, 99:20-100:13.

70. In summary, Dr. Duncan found that with all causes of the pancytopenia other than lymphoma eliminated, and with Mr. Brock presenting as a "fairly classic" patient with a lymphoma-type disease, that there is reasonable degree of medical certainty that Mr. Brock had lymphoma. Vol. 2, 86:7-11; 88:11, 101:1-5.

   d.   Dr. Mehta's opinions as to cause of death

71. Dr. Mehta testified that the medical evidence supports the contention that Mr. Brock had severe sepsis caused by a bacterial infection upon his admittance to Shands on March 27, 2019. Vol. 3, 66:15-18. Critical to Dr. Mehta's diagnosis was Mr. Brock's procalcitonin levels, which was measured from a blood sample collected from Mr. Brock just past midnight on March 29, 2019. Id. 66:19-25, 67:1-2; Jt. Ex. 11, UF_0268. Dr. Mehta explained that Mr. Brock's procalcitonin level was elevated, revealing the presence of a bacterial infection with ninety-five percent sensitivity. Vol. 3, 66:19-25, 68:4-17. Dr. Mehta admitted, however, that this sample was taken on March 29, 2019, two days after Mr. Brock was hospitalized, and did not rule out the possibility of an issue with the bone

---

[12] Bilirubin is a material made in the liver. Vol. 2, 99:20-25.

25

Case No. 3:21-cv-679-JAR-JBT

marrow. Id. at 69:9-25. Dr. Mehta did not address the possibility that the procalcitonin levels could have been due to an infection Mr. Brock gained while he was in the hospital and neutropenic with negligible white blood cells to combat infection.

72. Contrary to Dr. Schweiger and Dr. Duncan's opinion, Dr. Mehta testified that the administration of antibiotics can lead to false negative blood cultures, and that the prescription for doxycycline during Mr. Brock's March 21, 2019, visit likely invalidated the blood cultures. Id. 139:10-141:25. Dr. Mehta further cited the empiric antibiotics Shands placed Mr. Brock on upon arrival as a source of interference with the negative blood cultures. Id. 141:20-25. Dr. Mehta admitted, however, that the broad-spectrum antibiotics given to Mr. Brock at Shands had no impact on the blood cultures as the sample was taken prior to the administration of the antibiotics. Id. 76:8-11.

73. As a potential source for the bacterial infection, Dr. Mehta identified the cellulitis on Mr. Brock's lower left extremity, which a nurse discovered and noted was "suspicious for possible insect bite" on March 28, 2019. Vol. 3, 84:6-85:2; Jt. Ex. 11, UF_0103, UF_0128. Dr. Mehta, however, could not say within a reasonable degree of medical probability that this was the source of an infection. Vol. 3, 131:1-19. Additionally, Dr. Mehta did not address the fact that the infectious disease physician stopped several broad-spectrum antibiotics on March 28, 2019, nor the fact that the Dr. Ravi did not mention the lower left extremity as a potential source of infection in his diagnosis despite noting a bruise there.

74. Dr. Mehta admitted that there was no sign of viral sepsis or primary vital infection. Vol. 3, 125:3-4, 160:13-15.

75. Dr. Mehta testified that the evidence does not support a diagnosis of a hematological malignancy or lymphoma, but rather indicates a process destroying the cells outside of the

bone marrow. Vol. 3, 108:6-11. To support his contention, Dr. Mehta testified that although the lack of white blood cells was inconclusive regarding whether the bone marrow was functional, the presence of large platelets indicated that the bone marrow was functional and responding to an issue in the bloodstream. Vol. 3, 60:12-63:7. Additionally, Dr. Mehta noted the ineffectiveness of the transfusion Mr. Brock received, testifying that the only explanation of Mr. Brock's hemoglobin decreasing after a transfusion is active destruction in the blood itself. Id. at 95:15-23. Finally, Dr. Mehta pointed to Mr. Brock's enlarged spleen as evidence of an active process in the blood that was destroying cells, explaining that the spleen produces natural killer cells that drag red cells and platelets from the peripheral blood into the spleen and sometimes liver for destruction. Id. at 107:17-108:22.

76. Looking to the autopsy, Dr. Mehta found it conclusive that Mr. Brock's bone marrow was hypercellular yet not a single cancer cell was identified: ruling out blood cancer. Vol. 3, 192:21-23. Dr. Mehta explained that when cancers cause pancytopenia, they do so by infiltrating the bone marrow and crowding out healthy cells such that they cannot be produced in adequate amounts. Id. 106:8-10. Based on the severity of Mr. Brock's pancytopenia, Dr. Mehta testified that a cancer would have needed to be of such severity that it would have replaced the marrow within the cavity and that would have been immediately noticeable during the autopsy. Id. 106:11-20.

77. Dr. Mehta, however, did not address the note by the hematopathologist, who consulted on the bone marrow in the autopsy, which raised leukemia as a potential cause of Mr. Brock's hypercellularity. Pl.'s Ex. 1, J_0474. Dr. Mehta's testimony directly contradicted this

Case No. 3:21-cv-679-JAR-JBT

note, testifying that the autopsy definitively ruled out leukemia due to a lack of cancer cells in the bone marrow sample. Vol. 3, 103:19-105:2.

78. Additionally, Dr. Mehta contradicted himself concerning the reliability of the bone marrow biopsy in the autopsy. First, Dr. Mehta said, "if a patient passes away and an autopsy is done three, four, five days later, the reliability of a bone marrow biopsy is pretty low, and it's hard to really make any claims about it at all." Vol. 3, 103:9-12. Dr. Mehta continued that if the autopsy had been performed "even a week later [from the date of death,] I likely would not have given it any weight at that point." Id. at 105:20-23. This testimony matches the note left by the hematopathologist who reviewed the bone marrow biopsy and noted that it was difficult to draw conclusions due to autolysis. Pl.'s Ex. 1, J_0474. Dr. Mehta, however, later, after learning that the autopsy was performed five days postmortem rather than the same day, testified that he still believed that the sample was adequate due to the description of the bone marrow from the hematopathologist. Vol. 3, 108:23-109:25. Dr. Mehta, however, did not explain why the hematopathologist's description indicated the sample was adequate and the court does not credit his explanation. Id.

79. Finally, Dr. Mehta testified that there is no medical evidence to suggest that Mr. Brock suffered from lymphoma, primarily relying on the lack of swollen lymph nodes. Vol. 3, 176:21-25. Dr. Mehta did admit, however, that lymphoma could occur without lymph involvement if there was involvement of the bone marrow, but said that such a lymphoma would not cause pancytopenia. Id. at 176:21-177:25.

80. The court notes that many of the signs and symptoms Dr. Mehta relied upon for his eventual diagnosis were not present upon Mr. Brock's presentation to Shands.

Case No. 3:21-cv-679-JAR-JBT

81. First, the bruise on Mr. Brock's LLE was not documented until 5:18 p.m. on March 27, 2019, twelve hours after Mr. Brock presented to Shands. Jt. Ex. 11, UF_0103. Although Dr. Mehta testified that a bruise such as this could be missed by emergency room nurses and physicians as skin examinations are not the focus for someone who presents to the emergency room, Dr. Schweiger testified that it is standard practice to do extremely thorough examinations of neutropenic patients due to the increased risk of infection. Vol. 3, 149:5-151:11; Vol. 2, 176:19-177:21.

82. Second, Dr. Mehta relies heavily on Mr. Brock's procalcitonin levels to support Dr. Mehta's contention that Mr. Brock's pancytopenia was caused by severe sepsis. Vol. 3, 67:18-69:15. Nevertheless, the sample Dr. Mehta relies upon was taken on March 29, 2019, over 43 hours after Mr. Brock presented to Shands. Jt. Ex. 11, UF_0268. Dr. Schweiger testified, and the court agrees, that Mr. Brock was predisposed to developing sepsis due to his neutropenia, so it is not a surprise that on March 29, 2019, Mr. Brock had indicators of sepsis. Vol. 2, 199:7-200:9, 213:13-20.

83. Third, Dr. Mehta relies on the failed transfusions and the autopsy report to support his theory that a process was happening in the blood rather than the bone marrow itself. Vol. 3, 95:15-96:5. The transfusions, however, first took place on March 28, 2019, at which point Mr. Brock had been neutropenic for at least 24 hours and could have contracted an infection causing the results Dr. Mehta relies upon. Jt. Ex. 11, UF_0164. Dr. Mehta failed to explain how signs recorded after March 27, 2019, definitively show that Mr. Brock's pancytopenia was caused by an infection on March 26, 2019, despite Mr. Brock's apparently functioning organs the morning of March 27, 2019.

29

Case No. 3:21-cv-679-JAR-JBT

    e.  <u>More likely than not, Mr. Brock died of an acute hematological malignancy</u>

84.  In consideration of the inconsistencies in Dr. Mehta's testimony, his reliance on Mr. Brock's signs and symptoms to show an infection after Mr. Brock had been neutropenic for over 24 hours, his contradiction both with himself and with the hematopathologist who performed the autopsy, and his lack of specificity in excluding lymphoma, the court finds that Dr. Mehta's opinions are not credible and are unsupported by the evidence in this case.[13]

85.  The court finds that Dr. Schweiger's and Dr. Duncan's opinions were reasonable and consistent, and therefore accepts and incorporates all opinions listed <u>supra</u> findings 56–69 as to cause.

86.  In particular, the court finds that more likely than not, Mr. Brock's severe pancytopenia was caused by a hematological malignancy, most likely non-Hodgkin's lymphoma, and that upon his presentation to Shands on March 27, 2019, Mr. Brock did not have severe sepsis, or any bacterial or viral infection sufficiently advanced enough to cause his pancytopenia.

    f.  <u>Dr. Schweiger's opinions as to indicators of pancytopenia on March 21, 2019</u>

87.  Dr. Schweiger testified that Mr. Brock's death was preventable.  Specifically, Dr. Schweiger testified that had adequate time been available to work through the differential diagnosis, and importantly, had Mr. Brock been stable enough to obtain a bone marrow biopsy, that the cause of his pancytopenia would have been found.  Vol. 2, 200:1-22.  It is Dr. Schweiger's opinion that Mr. Brock would have been diagnosed with non-Hodgkin's

---

[13] The court notes that many of the signs Dr. Mehta relied upon to determine Mr. Brock had an infection upon admittance to Shands are consistent with the signs that Mr. Brock would exhibit had he been infected once admitted to Shands due to his low white blood cell count.

Case No. 3:21-cv-679-JAR-JBT

lymphoma as that specific type of hematological malignancy is consistent with Mr. Brock's signs and symptoms over the course of March 2019. Vol. 2, 232:15-234:13. Based on that diagnosis, Dr. Schweiger testified that within a reasonable degree of medical probability chemotherapy would have assisted Mr. Brock and that he would have survived for more than two decades. Id. at 223:16-22, 232:15-234:13.

88. Dr. Schweiger testified that had a CBC been performed on March 21, 2019, it would have shown the presence of pancytopenia. Vol. 2, 225:12-19. Based on his experience, Dr. Schweiger testified that Mr. Brock's pancytopenia was so extensive that it must have developed over a series of days or weeks. Vol. 2, 200:23-201:19. Had the pancytopenia been found on March 21, 2019, Mr. Brock would have been admitted to the hospital to undergo neutropenic precautions and he would have been healthy enough to undergo sufficient testing and treatment to survive. Id. at 201:20-202:15.

g. Dr. Duncan's opinions as to indicators of pancytopenia on March 21, 2019

89. Dr. Duncan testified that had a CBC been performed on March 21, 2019, it "would have absolutely shown pancytopenia." Vol. 2, 82:19-20. Dr. Duncan explained that Mr. Brock's continued febrile illness and symptomology over the eighteen days were consistent with pancytopenia, and testified that it is possible for a patient to have normal vital signs and be sick with pancytopenia or anemia. Id. at 82:13-83:9. Specifically, Dr. Duncan testified that Mr. Brock consistently had the signs and symptoms of blood cancer, including five of the seven early warning signs[14] throughout March 2019. Id. at 84:1-85:10. Finally, Dr. Duncan explained that both cancer, and pancytopenia, do not develop overnight and

---

[14] The five early warning signs listed in court were night sweats, fever and chills, fatigue, headaches, and shortness of breath. Vol. 2, 84:17-85:10.

Case No. 3:21-cv-679-JAR-JBT

accordingly there must have been evidence of pancytopenia on March 21, 2019. Id. at 109:19-110:22.

90. Dr. Duncan further testified that it was the delay in diagnosis, stabilization, and treatment of Mr. Brock's pancytopenia that caused his death. Vol. 2, 135:6-136:22. Accordingly, Dr. Duncan testified that had Mr. Brock been diagnosed earlier, he would not have died from the pancytopenia. Id. at 89:2-9, 131:13-132:9, 139:15-140:8. Additionally, it is Dr. Duncan's opinion that more likely than not, Mr. Brock would have survived. Id. Mr. Brock would have been put on chemotherapy and that lymphomatous diseases usually respond well to treatment. Id. at 85:21-86:11, 120:12-121:2. This was Dr. Hew's treatment plan and would have happened had Mr. Brock been sufficiently stable, thus, considering Mr. Brock's normal vitals on March 21, 2019, it is highly likely he would have been able to receive this treatment if administered earlier. Id. 86:12-87:12, 103:14-104:1.

91. Anecdotally, consistent with Dr. Duncan's testimony as a whole, Dr. Duncan testified to his personal experience with lymphoma and pancytopenia, which he was diagnosed with twenty-nine years prior to trial. Vol. 2, 87:19-89:11. Nonetheless, the court would reach the same conclusions without it.

h. Dr. Mehta's opinions as to indicators of pancytopenia on March 21, 2019

92. Dr. Mehta testified that if Mr. Brock had severe pancytopenia on March 21, 2019, there would have been objective physical findings in Mr. Brock's vital signs reflecting that condition. Vol. 3, 41:12-43:14. Dr. Mehta admitted, however, that a CBC may have shown a mild pancytopenia on March 21, 2019. Id. at 115:20-25.

Case No. 3:21-cv-679-JAR-JBT

93. Dr. Mehta testified that had the CBC shown mild pancytopenia on March 21, 2019, Mr.
Brock would not have gone down an acute diagnostic road with emergent care as his issues
would not have been severe enough. Id. at 116:1-117:1.

94. Dr. Mehta admitted that a patient with pancytopenia who has been diagnosed, treated, and
stabilized, who was then found to have an underlying blood cancer, can live a long life so
long as the cancer is treated. Vol. 3, 181:23-182:3. Additionally, Dr. Mehta admitted that
according to his employer, MD Anderson, the survival rate for non-Hodgkin's lymphoma
is 83% if confined to a single region and greater than 60% even at its most advanced stages.
Id. at 182:4-19.

95. Dr. Mehta admitted that Mr. Brock needed the transfusion, that it was given "more quickly
than normal," and that "his death came . . . because of the transfusion." Vol. 3, 98:10-
100:12.

    i.   More likely than not, Mr. Brock would have survived if he had received a CBC on
         March 21, 2019

96. In consideration of Dr. Mehta's expertise in oncology and hematology, compared against
Dr. Schweiger's expertise in critical care medicine and Dr. Duncan's expertise in clinical
pathology, the court reject's Dr. Mehta's opinion that had Mr. Brock been diagnosed with
mild pancytopenia on March 21, 2019, he would not have gone down an acute diagnostic
road. Supra Finding 93. Instead, the court accepts the opinions of Dr. Schweiger and Dr.
Duncan that Mr. Brock would have received the treatment necessary to stabilize his
pancytopenia and identify the source. Supra Findings 88, 90.

97. The court finds that Dr. Schweiger's and Dr. Duncan's opinions were reasonable and
consistent, and that the opinions are supported by the admissions of Dr. Mehta.

Case No. 3:21-cv-679-JAR-JBT

Accordingly, the court therefore accepts and incorporates all opinions listed supra Findings 85–90 as to causation.

98. In particular, the court finds that the testimony of all three causation experts clearly establishes that had a CBC been ordered on March 21, 2019, it would have identified elements of pancytopenia. Vol. 2, 82:15-20, 201:20-202:1; Vol. 3, 115:20-25.

99. Further, the court finds that more likely than not, had these elements been discovered on March 21, 2019, Mr. Brock would have been able to receive treatment and live a life unaltered by the underlying condition causing his pancytopenia.[15]

## V.   Damages

### a.   Economic Damages

100. Plaintiff presented Bernard Pettingill, Jr., Ph.D. as her expert on economic damages. Dr. Pettingill is an economist who specializes in medical and health economics. Vol. 1, 155:8-157:15. Dr. Pettingill has an undergraduate degree in economics, a Master of Business Administration with an emphasis in Economics, a Master of Public Health, and a Doctorate in Health Economics and Medical Economics. Id. Dr. Pettingill testified that he regularly performs economic loss evaluation and estimated that he testifies monthly at trial. Id. The court accepts Dr. Pettingill as a Rule 702 expert witness in economics. Id. at 174:25-175:4.

---

[15] The government argues that Mr. Brock's failure to have his blood drawn for the CMP indicates that Mr. Brock would not have completed the CBC. Def.'s Proposed Findings of Fact and Conclusions of Law at 62, ECF No. 75 (Oct. 27, 2023) ("Gov. Br."). The court disagrees. Considering ARNP Elgin's testimony that the CMP was not related to the diagnostic evaluation of Mr. Brock, Elgin Tr., 137:19-21, that Mr. Brock had had similar wellness tests previously, Jt. Ex. 5, NHJ_0257, that there is no indication that ARNP Elgin told Mr. Brock to get the wellness test done the same day, Jt. Ex. 5, NHJ_0254–57, and that Mr. Brock sought diagnostic blood work, id., it seems clear that Mr. Brock would have had his blood drawn had ARNP Elgin ordered a CBC and educated Mr. Brock on the importance of having the diagnostic testing done immediately.

Case No. 3:21-cv-679-JAR-JBT

101. Mr. Brock was employed by the U.S. Post Office, was in good standing, earned $18.00 an hour and worked roughly 40 hours a week. Vol. 1, 177:3-7. Dr. Pettingill, after reviewing Mr. Brock's recent work history, tax returns, and wage statement, estimated that Mr. Brock earned approximately $37,640.00 per year. Vol. 1, 162:17-163:2. This amount, Dr. Pettingill testified, would need to be reduced for tax and an additional 32% to compensate for Mr. Brock's personal consumption. Vol. 1, 178:9-12.

102. Dr. Pettingill included an additional 9% for "fringe benefits" which he described as vacation time, sick leave, holidays, and personal time. Vol. 1, 186:24-189:13; Jt. Ex. 12, USPS_0008-14.

103. Mrs. Brock and Mrs. Stepalavich testified to Mr. Brock's other duties such as working around the house, fixing things, cooking, painting, cleaning, and driving Mrs. Brock when she needed to leave the house. Vol. 1, 226:2-8, 235:15-236:19, 261:25-264:25. Based on a "Checklist for Economic Evaluation" that Mrs. Brock completed, Dr. Pettingill estimated that Mr. Brock's death caused a loss of twenty-two hours per week of household services. Vol. 1, 165:12-167:10; Pl.'s Ex. 21, ECF No. 65-3 (July 31, 2023) ("Pl.'s Ex. 21"). Dr. Pettingill valued those services at minimum wage, or $12.00 an hour, which he testified is a conservative number consistent with the standard economic methodology for the replacement value of household services. Vol. 1, 165:12-167:10.

104. Dr. Pettingill testified that based on life expectancy and work life expectancy charts he reviewed, he estimated Mr. Brock would have continued working until sixty-seven and then died around the age of eighty-two. Vol. 1, 160:19-162:5; Pl.'s Ex. 21.

105. Dr. Pettingill testified that based on these conclusions, to compensate Mrs. Brock for the economic loss of her husband, she would need $49,913 for past loss of household services,

35

$122,127 for past loss of support, $308,354 present value for future loss of household services, and $210,176 present value for future loss of support. Vol. 1, 170:3-171:13.

106. On cross-examination, the government raised several issues. First, that Dr. Pettingill had insufficient tax records and data to determine Mr. Brock's wages and loss. Vol. 1, 176:22-177:7. The court finds this concern meritless as Dr. Pettingill's estimates appear consistent with what would be expected for a postal office worker in good standing. Second, that Dr. Pettingill failed to properly deduct tax and consumption figures from his calculations. Id., Vol. 1, 183:8-186:16. Upon review of Dr. Pettingill's report, the court finds the 30% Dr. Pettingill testified to deducting was in fact deducted. Third, that Dr. Pettingill should not have included fringe benefits. Vol. 1, 186:24-189:13. The court finds that 9% is a reasonable amount to include for benefits Mr. Brock received that were not reflected in his paycheck. Fourth, that twenty-two hours a week in household services is not supported by the record. Vol. 1, 190:8-193:13. The court finds the record to reflect Mr. Brock provided 14 hours a week in household services in addition to those performed by Mrs. Brock rather than 22 hours a week as Mrs. Brock was not entirely reliant on Mr. Brock for local transportation and previously shared household chores. Finally, the government questioned Dr. Pettingill on prior limitations placed on his testimony by prior courts. Vol. 1, 205:14-212:17. The court finds that Dr. Pettingill's explanations were reasonable and that those prior cases are distinguishable from the case at hand and do not impact the court's interpretation of Dr. Pettingill's economic loss report or testimony.

107. Except as indicated, the court finds that Dr. Pettingill's opinions were reasonable and consistent. Accordingly, the court therefore accepts and incorporates all opinions listed supra Findings 100–106, except as specifically indicated, as to economic damages.

Case No. 3:21-cv-679-JAR-JBT

108. The court finds that the Estate of Richard Brock and Joy Brock have suffered a present value economic loss of $560,291, comprised of $31,763 for past loss of household services, $122,127 for past loss of support, $196,225 present value for future loss of household services, and $210,176 present value for future loss of support.

### a. Non-Economic Damages

109. Mrs. Stepalavich testified that Mr. and Mrs. Brock had an extremely strong and happy marriage.  Vol. 1, 226:23-236:19.

110. Mrs. Brock testified to her distress after Mr. Brock's death, the loss of the house they purchased together, and her adjustments in the intervening years.  Vol. 1, 260:5-261:24, 272:15-278:21.

111. The court finds that Mrs. Brock incurred non-economic damages due to loss of companionship, and that Mrs. Brock suffered significant mental pain and anguish.

112. The court finds non-economic damages in the amount of $500,000 is fair and adequate to compensate Mrs. Brock, as surviving spouse of Mr. Brock, for her past non-economic damages.

113. The court finds non-economic damages in the amount of $1,000,000 is fair and adequate to compensate Mrs. Brock, as surviving spouse of Mr. Brock, for her future non-economic damages.

### CONCLUSIONS OF LAW

114. The findings of fact set forth above clearly dictate the outcome of this case.  As explained at the outset, in comparison to the facts, the law in this case is straightforward.  First, the court must determine the standard of care applicable in this case.  Supra APPLICABLE LAW § I.  Then, the court must decide whether, based on her care of Mr. Brock, ARNP

37

Case No. 3:21-cv-679-JAR-JBT

Elgin breached the standard of care. Id. Finally, if a breach occurred, the court must decide

whether that breach proximately caused Mr. Brock's injuries. Id. The plaintiff bears the

burden of establishing all three of these elements by a more likely than not standard. Prieto

v. Total Renal Care, Inc., 843 F. App'x 218, 224 (11th Cir. 2021).

### I.   Standard of Care

115. In medical malpractice actions, the plaintiff:

> shall have the burden of proving by the greater weight of evidence that the
> alleged actions of the health care provider represented a breach of the
> prevailing professional standard of care for that health care provider. The
> prevailing professional standard of care for a given health care provider
> shall be that level of care, skill, and treatment which, in light of all relevant
> surrounding circumstances, is recognized as acceptable and appropriate by
> reasonably prudent similar health care providers.

Fla. Stat. § 766.102(1). Specifically, the "failure of a health care provider to order, perform,

or administer supplemental diagnostic tests shall not be actionable if the health care

provider acted in good faith and with due regard for the prevailing professional standard of

care." Fla. Stat. § 766.102(4).

116. The government argues that the court should analyze whether ARNP Elgin breached the

standard of care in the context of her diagnosis of Mr. Brock with a URI. Gov. Br. at 32.

Additionally, the government argues that Dr. Vasquez established that the standard of care

does not require clinicians to order any diagnostic testing for patients with a suspected URI.

Gov. Br. at 38.

117. The court disagrees, however, that the standard of care should be predicated upon the

diagnosis of a URI. The actions of a health care provider are evaluated based on "all

relevant surrounding circumstances," not purely within the context of the diagnosis

determined by the provider in question. Fla. Stat. § 766.102(1). Thus, Dr. Vasquez's

38

Case No. 3:21-cv-679-JAR-JBT

testimony and the government's arguments about what is or is not reasonable within the context of a URI diagnosis are not relevant; rather, the court considers what the standard of care would require of a provider considering a patient like Mr. Brock.

118. The court concludes that the standard of care requires a provider, presented with the information available to ARNP Elgin on March 21, 2019, to order diagnostic testing that includes a CBC when evaluating a patient presenting with Mr. Brock's symptoms and treatment history.[16]

## II.    Breach

119. It is undisputed that ARNP Elgin did not order a CBC for Mr. Brock on March 21, 2019. See supra Findings 24, 26. Ergo, the court concludes that ARNP Elgin breached the standard of care by failing to order a CBC.

## III.   Proximate Cause

120. The testimony of all three causation experts established that had a CBC been taken on March 21, 2019, it would have shown signs of pancytopenia. See supra Finding 98. Accordingly, the question before the court is had those signs been found on March 21, 2019, would Mr. Brock have been treated and survived.[17]

---

[16] The parties contest what may or may not have happened during the visit on March 21, 2019. Gov. Br. at 7–19; Brock Br. at 9–12, 153. The court finds, however, that because ARNP Elgin does not remember Mr. Brock's visit, the medical record is the dispositive source for determining what information ARNP Elgin had on March 21, 2019, and what she did. Elgin Tr. 88:2-25. The question of what a provider with additional information might do is not before the court and is not reached.

[17] In prior briefing before the court, the government argued that the "stacking of inferences" is prohibited. Defs.' Mot. for Summ. J. at 6–9, ECF No. 26 (Dec. 22, 2022). The Eleventh Circuit has clearly stated that it does "not apply state-law rules against 'pyramiding' or 'stacking' inferences." Berbridge v. Sam's East, Inc., 728 Fed. Appx. 929, 932 (11th Cir. 2019) (citing Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1326 (11th Cir. 1982)). Nevertheless, here, the court does not reach this legal question as no stacking is required. The standard of care was breached, and Mr. Brock died of a disease that more likely than not would have been

Case No. 3:21-cv-679-JAR-JBT

121. The experts from each side offered conflicting opinions as to whether Mr. Brock would have survived had ARNP Elgin ordered a CBC on March 21, 2019. The court, however, is free to accept an expert witness opinion, reject it, or give it the weight the court thinks it deserves, considering the knowledge, skill, experience, training, or education of the witness, the reasons given by the witness, and all the other evidence in the case.

122. Here, the court accepted Dr. Schweiger's and Dr. Duncan's opinions as to a potential treatment plan and survival due in large part to the consistency of their testimony and relative expertise. Supra Findings 56–69. Conversely, the court rejected Dr. Mehta's opinions on a treatment plan due in part to the inconsistencies in his testimony. Supra Findings 81–83, 92–94. Additionally, Dr. Mehta did not provide an opinion as to whether Mr. Brock could have survived a hematological malignancy had treatment begun on March 21, 2019. See generally, Vol. 3, 168:17-197:6.

123. Accordingly, the court concludes that the evidence supports that more likely than not, had a CBC been ordered on March 21, 2019, Mr. Brock would have survived. Ergo, ARNP's breach was the proximate cause of Mr. Brock's injuries.

**IV.    No Comparative Negligence by Mr. Brock**

124. At trial, the defendant confirmed that it was not claiming comparative negligence by Mr. Brock. Vol. 4, 166:5-167:7. Without affirmatively pleading that some or all responsibility

---

diagnosed and successfully treated if the breach had not occurred. The only matter then seems to the court to be debatable is what disease Mr. Brock actually had. But the defendant's witness on this point was so deficient that the weight of the testimony favors plaintiff's view of the disease and likely outcome if properly diagnosed. Dr. Mehta is an oncologist, not an expert in infectious diseases, and was thus ill equipped to support the theory that Mr. Brock's pancytopenia was caused by some unknown infectious disease not identified by the infectious disease specialists at Shands. Additionally, Dr. Mehta's testimony only briefly addressed the possibility of a hematological malignancy and was insufficient to overcome the testimony of both Dr. Schweiger and Dr. Duncan.

Case No. 3:21-cv-679-JAR-JBT

lies with Mr. Brock or a nonparty, the court concludes that all damages should be apportioned to the United States. Accordingly, the court hereby grants Plaintiff's Rule 52 motion to dismiss Defendant's Eighth Affirmative defense of contributory negligence.

## V.    Damages allowable under Florida law

125. The Florida Wrongful Death Act dictates that each survivor of the decedent may be awarded an amount of money that the greater weight of evidence shows will fairly and adequately compensate the survivor for lost support and services from the date of the decedent's injury to his death, with interest, and future loss of support and services from the date of death and reduced to present value. Fla. Stat. § 768.21(1) (2020).

126. The decedent's personal representative may recover for the decedent's estate the decedent's loss of earnings, decreased from the date of injury to the date of death, and the loss of prospective net accumulations of the estate, reduced to present money value. Fla. Stat. § 768.21(6)(a) (2020).

127. The surviving spouse may also recover for loss of the decedent's companionship and protection for mental pain and suffering from the date of injury. Fla. Stat. § 768.21(2) (2020).

## CONCLUSION

The court concludes that the plaintiff has met its burden to prove the elements of medical malpractice under the Federal Tort Claims Act, and in accordance with the foregoing findings of fact and conclusions of law, it is hereby

**ORDERED** that judgment shall be entered in favor of the plaintiff and against the United States in the above matter in the amount of $2,060,291 to Joy Brock, as personal representative of

Case No. 3:21-cv-679-JAR-JBT

the Estate of Richard Brock.  The Clerk is directed to terminate any pending motions and deadlines, and to close the file.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: January 25, 2024
New York, New York

42